1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MANJEET K. KANG et al.,
                Plaintiffs,

    v.

NATIONSTAR MORTGAGE LLC, et al.,
                Defendants.

CASE NO. C23-5106-KKE

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Plaintiffs Manjeet and Amrik Kang, appearing *pro se*, filed this case to stop the pending trustee sale on their property. They sued Defendants Nationstar Mortgage LLC ("Nationstar") and U.S. Bank National Association[1] ("US Bank") for violating their obligations under the parties' agreements, including failing to honor a debt forgiveness term and incentive payment term and mismanaging the Kangs' payments and escrow funds. Defendants[2] now move for summary judgment dismissing the case arguing it is barred by *res judicata* and the class action settlement in *Robinson v. Nationstar Mortgage LLC* and because Defendants complied with all the relevant

---

[1] The Kangs named "U.S. Bank National Association, whose parent company is U.S. Bancorp" as a defendant. Dkt. No. 1 at 2. In its answer, Defendants argue the correct entity is "U.S. Bank National Association, as Trustee for Specialty Underwriting and Residential Finance Trust Mortgage Loan Asset-Backed Certificates, Series 2006-BC5." Dkt. No. 29 ¶ 2. The Kangs do not dispute this is the correct defendant, and the July 12, 2013 notice to the Kangs confirms Nationstar is servicing the loan on behalf of "U.S. BANK NA AS TRUSTEE FOR SURF 2006-BC5." Dkt. No. 26-4.

[2] Neither party differentiates between the actions of the two Defendants, so the Court will generally refer to "Defendants" unless the context requires differentiating between them.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

agreements.  The Court finds *res judicata* does not apply here as the scope of the release in *Robinson* does not cover these claims.  But the Court grants summary judgment for Defendants on the Kangs' claims because Defendants complied with the agreements.

## I.  BACKGROUND

On July 10, 2006, the Kangs received a $268,200 loan in exchange for an Adjustable Rate Note secured by a Deed of Trust on real property located in Puyallup, Washington.  Dkt. Nos. 26-2, 26-3.  After the Kangs defaulted on the loan (Dkt. No. 26-5) and Nationstar commenced nonjudicial foreclosure (Dkt. No. 26-1 ¶ 8), the Kangs applied for loss mitigation through applications for mortgage assistance (*id.*; Dkt. Nos. 26-6, 26-7).

On June 13, 2016, Nationstar sent a trial period plan notice to the Kangs in which they would make three trial period payments and submit certain documents to qualify them for a permanent modification of the loan terms.  Dkt. No. 26-8 at 2–3.  This notice included a FAQ document.  *Id.* at 4–8.  In response to a question about qualifying for a modified loan, the answer said, "Once you make all of your trial period payments on time, we will send you (i) a Streamline HAMP Affidavit and (ii) two copies of a modification agreement detailing the terms of the modified loan."  *Id.* at 4.  The FAQ also stated, "If your loan is permanently modified and you remain in good standing for six years, you will receive a one-time pay-for-success incentive of $5,000" ("Incentive Payment").  *Id.* at 6.  The Kangs timely paid the three trial period payments. Dkt. No. 26-1 ¶ 10.

On September 6, 2016, Nationstar sent a packet of materials to the Kangs regarding the loan modification.  Dkt. No. 26-9.  At the front, the packet included a cover letter that stated, "The enclosed Home Affordable Modification Agreement… reflects the proposed terms of the modified mortgage" and instructed the Kangs that "[t]o accept this offer, <u>you must sign and return both copies</u> of the Modification Agreement[.]"  *Id.* at 3.  The cover letter also stated, "To better

understand the proposed terms of the modified mortgage, please read the attached summary of the modified mortgage and the Modification Agreement." *Id.* The cover letter listed "Attachments: Summary of the Modified Mortgage, Two copies of the Modification Agreement." *Id.* at 4.

After the cover letter, the packet then included a summary describing the terms of the modified mortgage ("Summary Document"), including a section entitled "Principal Reduction Alternative" ("PRA") that stated

> You may be eligible to have some of the principal forgiven on a deferred basis. If you make the voluntary monthly mortgage payments on time, we will forgive $46,505.51 of the principal balance of the loan each year on the anniversary of the first trial period payment date for three years.

Dkt. No. 26-9 at 5. The Summary Document also contains a provision entitled "Deferral of Principal," which states that Nationstar "will defer collection of and not collect interest on $139,516.52 of your outstanding principal. You will not be required to make monthly payments on that portion. This portion of principal will be due when you pay off the modified loan…." *Id.*

After the Summary Document, the packet included a Loan Modification Clarity Commitment "intended to be a clear and simple summary of the final loan modification that we are pleased to offer you," which broke down the new principal balance. Dkt. No. 26-9 at 6 ("Clarity Commitment"). The Clarity Commitment does not contain the PRA term or reference any loan forgiveness option. *Id.* It does include the Deferred Principal Balance of $139,516.52 and states, "Borrower will not be required to pay interest or make monthly payments on the Deferred Principal Balance until the time of maturity." *Id.*

Nationstar next included a document listing closing and signing requirements and confirming "Borrower must return Both sets of ORIGINAL signed documents…." Dkt. No. 26-9 at 7. Following this document, the packet included a two-page Agreement to Maintain Escrow Account (*id.* at 8–9), then a two-page document for borrowers to complete to activate autopay (*id.*

at 9–10).  Finally, there were two copies of a seven-page document entitled Home Affordable Modification Agreement ("HAMA").  *Id.* at 12–26.  Unlike the Summary Document, these documents did not contain a PRA provision or any provision providing debt forgiveness.  *Id.*, Dkt. No. 26-1 ¶ 11.  Instead, the HAMA deferred $139,516.52 of the new balance without interest and increased the repayment term to 40 years at a fixed 3.125% interest rate, totaling "monthly installments of principal and interest of $1,188.95 and a monthly escrow of $399.71 subject to periodic adjustment."  Dkt. No. 26-1 ¶ 11, *see also* Dkt. No. 26-12 at 13–19.

The Kangs signed the Agreement to Maintain Escrow Account on September 9, 2016 ("Escrow Agreement").  Dkt. No. 26-12 at 20–21.  The Kangs also signed the HAMA.  *Id.* at 19.  Nationstar countersigned the HAMA on September 19, 2016.  Dkt. No. 26-12 at 13–19.

The Kangs began making timely monthly payments under the HAMA in September 2016.  Dkt. No. 26-1 ¶ 14.

On December 15, 2016, Nationstar mailed a letter to the Kangs stating, "When we previously forwarded the Streamline HAMP modification documents to you, this affidavit was omitted.  It is imperative that you sign and return this affidavit to us at your earliest convenience to ensure you are eligible for the Six Year Pay for Performance incentive payment of $5,000."  Dkt. No. 30-7.  There is no evidence this affidavit was ever signed by the Kangs or returned to Nationstar.

On January 16, 2020, the Kangs signed a Biweekly AutoPay Authorization Form, which initiated automatic recurring ACH debits every other Friday.  Dkt. No. 26-10.

In April 2020, the Kangs contacted Nationstar criticizing the biweekly autopay process and related processing fee.  Dkt. No. 26-11.  They also argued that Nationstar had violated the original agreement by refusing to forgive the $139,516.52 as promised in the HAMA.  *Id.*  On April 30, 2020, Nationstar responded to the Kangs' letter and explained the Kangs had signed an

authorization for biweekly autopay that stated, "there may be a fee of up to $2.50 per debit" and that the Kangs had not cancelled their biweekly autopay. Dkt. No. 26-12 at 3. The letter also explained that the PRA language was included by mistake in the Summary Document, but that Nationstar would nonetheless honor the PRA and forgive $139,516.52 and honor the $5,000 Incentive Payment under the Six Year Pay for Performance term subject to the Kangs' agreement to an updated loan modification document. *Id.* at 2–3. Nationstar sent an updated loan modification that included the terms for forgiveness of $139,516.32 and $5,000 outlined in the response letter ("Updated Loan Modification"). Dkt. No. 26-13 at 10–13. This new packet included another Agreement to Maintain Escrow Account. *Id.* at 6–7. In its cover letter with the Updated Loan Modification, Nationstar stated the Kangs must "sign and return both original Modification Agreements in the enclosed pre-paid envelope so they are received by us on or before **May 31, 2020.**" *Id.* at 2. The Kangs did not return the Updated Loan Modification. Dkt. No. 26-1 ¶ 18.

On August 13, 2020, the Kangs sent another dispute letter to Nationstar claiming Nationstar had violated the HAMA, "cheated" on the biweekly mortgage, failed "to offer an interest rate in line with the current market rates even by changing the term of the loan and still calls it a loan modification[,]" changed the loan specialist, failed to assure loan forgiveness, and that it "has kept it intentionally murky as to what will happen to 'almost one year since last October.'" Dkt. No. 26-14. The Kangs also generally complained about Nationstar's failure to answer the phone. *Id.* Lastly, the Kangs criticized Nationstar's "willingness to take care of the largest issue" of the HAMA violation "and then started to give me the run around to make the deadline expire because you were never sincere or truthful to begin with." *Id.*

On August 31, 2020, Nationstar responded to the Kangs with explanations for the interest rate and biweekly payments. Dkt. No. 26-15. Nationstar also offered to retroactively extend the

1   acceptance deadline for the Updated Loan Modification from May 31, 2020 until September 7,

2   2020. *Id*. at 3. The Kangs received this letter on September 8, 2020 (Dkt. No. 30 at 11), and

3   returned the signed Updated Loan Modification on September 10, 2020, with a handwritten

4   addition to paragraph two. Dkt. No. 26-1 ¶ 21. The Kangs inserted language that said: "The

5   forgiveness amount of $139,516.52 will be reduced by one-third ($46,505.51) each year starting

6   October 1st 2019, and will be zero in three years on October 1st 2022." Dkt. No. 26-16 at 3, 7.

7   The Kangs did not return a signed copy of the new Agreement to Maintain Escrow Account. Dkt.

8   No. 26-1 ¶ 21. Nationwide never countersigned the Updated Loan Modification with the Kangs'

9   additions. Dkt. No. 26-1 ¶ 21, Dkt. No. 30 at 11.

10          The Kangs continued to make timely payments until they entered the COVID forbearance

11  plan in October 2020, which paused their payments until September 1, 2021. Dkt. No. 26-1 ¶ 22,

12  Dkt. No. 26-17. At the end of the forbearance, the Kangs deposited money to cover the paused

13  payments. The Kangs allege that when they recommenced regular mortgage payments, a

14  refundable excess amount of around $2,700 remained in their escrow account. Dkt. No. 1 ¶ 5.

15  The Kangs contend that they requested a refund of this amount in October, November, and

16  December 2021 (Dkt. No. 38 at 5), and that Defendants refused to refund the excess or apply it to

17  future escrow payments until the annual escrow analysis could be completed in May 2022. Dkt.

18  No. 30 at 12–13. Thus, in January 2022, "the Kangs started submitting payments of $1,188.95

19  instead of the full amount of $1,652.82[.]" Dkt. No. 26-1 ¶ 26, *see also* Dkt. No. 26-22 at 124–

20  26.

21          On January 19, 2022, the Kangs submitted an online dispute form to Nationstar

22  complaining that "Nationstar had the Kangs deposit more money into the escrow account than was

23

24

actually needed to make the 'loan current.'"[3]  Dkt. No. 26-1 ¶ 27.  Nationstar responded on January 28, 2022, referring the Kangs to the Deed of Trust and explaining "funds cannot be applied to a monthly payment if the amount is short of the full amount needed for all portions of your monthly payment including the interest due, principal portion, and escrow account" and providing instructions on when the escrow account could be cancelled or waived.  Dkt. No. 26-19 at 2.

On April 27, 2022, the Kangs sent a letter to Nationstar complaining about an April 1, 2022 letter "threatening me with a foreclosure,"[4] "wrongful shortfalls in my account," "breach of contract by not removing the non interest bearing amount from my mortgage," and failure to apply escrow funds.  Dkt. No. 30-8, Dkt. No. 26-1 ¶ 28.  On May 19, 2022, Nationstar responded explaining that Nationstar had only received partial payments since January 2022, and stating, "To bring the account current, funds in the amount of $2,319.35 are needed."  Dkt. No. 26-20 at 3.  The response also explained the April 1, 2022 letter was sent to the Kangs "per Washington State Guidelines [] to inform you of your rights and a notice of pre-foreclosure options."  *Id.*

On February 8, 2023, the Kangs sued Defendants.  Dkt. No. 1.  While the Kangs did not list any specific causes of action, they mainly complained about the trustee sale scheduled for May 5, 2023[5] on the Puyallup property and Nationstar's failure to comply with the HAMA.  *Id.*  The Kangs allege Nationstar (1) violated the HAMA by not forgiving the $139,516.52 or honoring the $5,000 Incentive Payment promised in the HAMA (*id.* ¶¶ 1–2), (2) incorrectly applied the Kangs' biweekly automatic payment and improperly charged $2.50 for each payment (*id.* ¶ 3), and (3)

---

[3] The Kangs belatedly argue they did not submit such a dispute.  Dkt. No. 38 at 7.  The Court finds it unnecessary to resolve this issue.

[4] Neither party provided a copy of this communication to the Court.

[5] The trustee sale was postponed and has not occurred.  *See* Dkt. No. 34 at 14, Dkt. No. 37 at 4 n.2.

engineered the Kangs' delinquency by incorrectly applying the Kangs' payments for principal and interest and mismanaging escrow funds (*id.* ¶¶ 5, 7, 8).

Defendants now move for summary judgment dismissing the Kangs' case because it is barred by *res judicata*; the parties never agreed to the terms the Kangs allege Defendants violated; and the Kangs had notice of, and agreed to, the acts they now dispute. Dkt. No. 26. The Kangs filed an opposition (Dkt. No. 30), Defendants filed a reply (Dkt. No. 33), the Kangs filed another response (Dkt. No. 34),[6] and the Court instructed Defendants to file any new response by July 15, 2024, which they did (Dkt. No. 37). Four days later, the Kangs filed a third response with four exhibits. Dkt. No. 38.[7] The matter is ripe for the Court's consideration.

## II.   ANALYSIS

### A.   The Court Has Subject Matter Jurisdiction.

The Kangs allege the Court has subject-matter jurisdiction under 28 U.S.C. § 1332. Dkt. No. 1 at 2. Diversity jurisdiction exists over all civil actions where the matter in controversy exceeds $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1). The amount in dispute exceeds $75,000. *Id.* ¶ 3. The Kangs are each a citizen of Washington state. *Id.* ¶ 1. Nationstar is a citizen of Delaware. Dkt. No. 12. U.S. Bank is a citizen of Ohio. 28 U.S.C. § 1348 ("All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located."); *see*

---

[6] The Court acknowledges that the Kangs did not follow this Court's local rules when it filed this untimely additional response. *See* Local Rules W.D. Wash. LCR 7. However, because the Court provided Defendants an opportunity to respond (Dkt. No. 35) and Defendants explicitly do not seek to strike the additional brief (Dkt. No. 37 at 6), the Court will consider it.

[7] Again, Plaintiffs violated Court rules when filing their third response. The Court will consider the document because Defendants do not oppose the late filing and will not be prejudiced since the Court grants Defendants' motion for summary judgment.

1   U.S. Bank National Association, Statement of Eligibility Under the Trust Indenture Act of 1939

2   of a Corporation Designated to Act as a Trustee, Ex. 1 (Form T-1) (Feb. 26, 2002).

3       "[F]ederal courts sitting in diversity apply state substantive law."  *Cuprite Mine Partners*

4   *LLC v. Anderson*, 809 F.3d 548, 554 (9th Cir. 2015).

## B.   Legal Standard on Summary Judgment

6       Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the

7   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

8   judgment as a matter of law."  A principal purpose of summary judgment "is to isolate and dispose

9   of factually unsupported claims[,]" so that "factually insufficient claims or defenses [can] be

10  isolated and prevented from going to trial with the attendant unwarranted consumption of public

11  and private resources."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986).  In resolving

12  a motion for summary judgment, the Court considers "the threshold inquiry of determining

13  whether there is the need for a trial—whether, in other words, there are any genuine factual issues

14  that properly can be resolved only by a finder of fact because they may reasonably be resolved in

15  favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

16      The moving party bears the initial burden of identifying those portions of the pleadings,

17  discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

18  *Corp.*, 477 U.S. at 323.  When the non-moving party opposing summary judgment would have the

19  burden of proof at trial, the moving party need only show "that there is an absence of evidence to

20  support the nonmoving party's case."  *Id.* at 325.  If the moving party meets its initial burden, the

21  non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts

22  showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.

23

24

1

2

**C.     Defendants' Motions to Strike Are Denied.**

Federal Rule of Civil Procedure 37(c) provides in part that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see R & R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1247 (9th Cir. 2012) ("We recognize that, in the ordinary case, violations of Rule 26 may warrant evidence preclusion.").  The party facing sanctions bears the burden of proving the late disclosure was substantially justified or is harmless.  *See id.* at 1246.  The 1993 advisory committee notes to Rule 37(c) clarify that limiting the automatic sanction for insufficient disclosure "to violations 'without substantial justification,' coupled with the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety of situations," such as when a *pro se* litigant lacks knowledge "of the requirement to make disclosure."  Fed. R. Civ. P. 37(c) Advisory Committee Notes (1993).

Defendants move to strike two sets of exhibits.  Dkt. No. 33 at 7–10, Dkt. No. 37 at 6–7.  First, they move to strike nine exhibits filed by the Kangs with their opposition to the motion for summary judgment because the documents were not produced in discovery.  Dkt. No. 33 at 7–10.  The Court only considered exhibit 8 submitted with the Kangs' opposition, as the remaining exhibits are not relevant.  *See* Dkt. Nos. 30-8, 30-11; *In re Medvedev*, No. BR 22-10858-MLB, 2024 WL 2723776, at *3 n.1 (W.D. Wash. May 28, 2024) (denying a motion to strike as moot when the "Court does not rely on the challenged evidence in resolving the issues pending before it").  Accordingly, Defendants' request to exclude the other exhibits under FRCP 37(c) is denied as moot.

Exhibit 8 is an April 27, 2022 letter from the Kangs to Nationstar (Dkt. No. 30-8), which Nationstar refers to in its corporate declaration.  Dkt. No. 26-1 ¶ 28 ("Nationstar received a further

dispute from the Kangs in April 2022 concerning the escrow account."). Nationstar knew about this document, and while the Kangs may have had to disclose this document in discovery, exclusion is unwarranted because any failure to disclose was harmless. *See Joe Hand Promotions, Inc. v. Santana*, 964 F. Supp. 2d 1067, 1072 n.3 (N.D. Cal. 2013) (finding failure to disclose was harmless because defendants "presumably knew their contents and had access to them"). Defendants' motion to strike this exhibit is denied.

Second, Defendants move to strike 18 exhibits filed in support of the Kangs' second response, again, for failure to disclose the documents during discovery. Dkt. No. 37 at 6–7. The Court does not rely on any of these exhibits in making its decision, so Defendants' request to exclude these exhibits under FRCP 37(c) is denied as moot.[8]

**D.    This Case Is Not Barred by Res Judicata.**

Defendants argue this case is barred by the nationwide class settlement in *Robinson v. Nationstar Mortgage LLC*, Case No. 8:14-cv-03667-TJS, in the United States District Court for the District of Maryland ("*Robinson*") because that settlement released Nationstar from liability for certain claims, including ones like this. Dkt. No. 26 at 9–13. To determine whether res judicata applies, the Court must determine whether the release of claims in *Robinson* binds the Kangs and includes the claims here. *See Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689–90 (9th Cir. 2019) ("[G]iven the contractual nature of...settlement agreements, the preclusive effect of a judgment based on such an agreement can be no greater than the preclusive effective of the agreement itself." (quotations omitted)).

---

[8] The Court references docket number 34-3 in this decision, a bank transaction summary showing the amounts the Kangs paid in September and October 2021 to Nationstar. But the Court does not rely on the contents of that exhibit to make its decision, instead referencing the exhibit as an example of irrelevant evidence.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The *Robinson* class settlement resolved all claims against Nationstar[9] "in connection with the submission of loss mitigation applications" from January 10, 2014 through September 9, 2019. Dkt. No. 26-24 at 3, 17.  Nationstar showed the Kangs did not opt out of this settlement (Dkt. No. 26-25), and the Kangs have provided no evidence to the contrary.

While the Court agrees the Kangs are bound by the *Robinson* settlement, Defendants have not shown that the claim is connected with "the submission of loss mitigation applications" such that it was released by the *Robinson* settlement.  While the phrase "submission of loss mitigation applications" is vague, reviewing the rest of the Settlement Agreement clarifies that the type of claims resolved by the agreement include:

> - Nationstar didn't send me a letter within 5 days of getting my loss mitigation application.
>
> - Nationstar didn't make a decision on my loan modification application within 30 days.
>
> - Nationstar didn't tell me I could appeal its decision.
>
> - Nationstar asked me to submit documents I had already submitted.

Dkt. No. 26-24 at 9 (excerpt from Question 1 of the claim form).  The Settlement Agreement explicitly states that "Each Claimant who selects 'No' in response to Question 1 will not receive a Settlement Share."  *Id.*  The Kangs do not complain about these actions, or any other actions connected to their loss mitigation application.  Instead, the Kangs complain about actions taken after they were found eligible for a modified loan, after and separate from the application process. The *Robinson* settlement does not bar these claims against Nationstar, and Defendants' motion for summary judgment on this ground is denied.

---

[9] Defendants do not explain how the *Robinson* settlement would impact claims against U.S. Bank.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 12

1

**E.      The Parties Did Not Agree to the PRA Term.**

2

The Kangs argue two alternative theories about why Nationstar should be bound by the

3

PRA term included in the Summary Document and forgive $139,516.52 of their loan.   Neither

4

raises an issue of fact sufficient to defeat Defendants' motion.

5

First, the Kangs argue the PRA language, agreeing to forgive $46,505.51 of the principal

6

balance of the loan each year for three years, included in the Summary Document was an

7

enforceable term of the HAMA.  Dkt. No. 1 ¶ 1.  Defendants respond that the PRA language was

8

not a part of the actual HAMA, and the Summary Document is not an enforceable agreement under

9

the statute of frauds.  Dkt. No. 26 at 13.  The Court agrees.

10

There is no dispute that the HAMA does not include a PRA term or any similar loan

11

forgiveness provision.  Dkt. No. 26-12 at 13–19.  If the Kangs argue the Summary Document

12

included in the packet of material sent by Nationstar in September 2016 should be considered part

13

of the HAMA and enforceable, the evidence does not support this theory for at least three reasons.

14

First, the bottom of the Summary Document states, "Please read the enclosed Modification

15

Agreement carefully and make sure that you understand it and that the statements set forth therein,

16

including, but not limited to, the 'My Representations' section, are true and accurate."  Dkt. No.

17

26-9 at 5.  This notice alone should have notified the Kangs that the Summary Document was not,

18

itself, a part of the HAMA.  Second, the Clarity Commitment, which was described as a "clear and

19

simple summary of the final loan modification that we are pleased to offer you," includes the

20

Deferral of Principal Term but does not mention any PRA loan forgiveness.  Dkt. No. 26-9 at 6.

21

Third, Nationstar explains in the packet (Dkt. No. 26-9 at 3, 7) and the FAQ page of the trial period

22

document (Dkt. No. 26-8 at 4) that two copies of the agreement must be signed and returned and

23

there were only two copies of the seven-page HAMA.

24

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 13

1

2   If the Kangs argue the Summary Document alone is an enforceable contract, Defendants

3   are correct such an unsigned document is barred by the statute of frauds because it could not be

4   performed within a year.  WASH. REV. CODE § 19.36.010 (requiring "[e]very agreement that by its

5   terms is not to be performed in one year from the making thereof" to "be in writing, and signed by

6   the party to be charged therewith").  Moreover, the PRA term in the Summary Document does not

7   guarantee loan forgiveness, but states, "You *may* be eligible to have some of the principal forgiven

8   on a deferred basis."  Dkt. No. 26-9 at 5 (emphasis added).  In short, the PRA term is not

9   enforceable via the HAMA or the Summary Document.

Second, the Kangs argue that the PRA loan forgiveness term was included in the Updated

Loan Modification, which they accepted by signing and returning to Nationstar on September 10,

2020.  Dkt. No. 1 ¶ 1, Dkt. No. 30 at 9.  Defendants argue the Updated Loan Modification was

never agreed to because the copy signed by the Kangs included a handwritten new term that was

not accepted by Nationstar.  Dkt. No. 26 at 16.[10]  The handwritten term that the Kangs added in

September 2020 states, "The forgiveness amount of $139,516.52 will be reduced by one-third

($46,505.51) each year starting October 1st 2019, and will be zero in three years on October 1st

2022."  Dkt. No. 26-16 at 3, 7.  In Washington,

> [t]he acceptance of an offer is always required to be identical with the offer,
> or there is no meeting of the minds and no contract. An expression of assent
> that changes the terms of the offer in any material respect may be operative
> as a counteroffer; but it is not an acceptance and consummates no contract.

*Blue Mountain Const. Co. v. Grant Cnty. Sch. Dist. No. 150-204*, 306 P.2d 209, 212 (Wash. 1957)

(cleaned up).  The handwritten addition changed the contract's material terms by including loan

---

[10] The Kangs dispute whether the September 7, 2020 deadline to return the Update Loan Modification was reasonable. Dkt. No. 30 at 11.  While Defendants note Nationstar received the signed copy late (Dkt. No. 26 at 2), Defendants do not argue that this delay impacts the enforceability of the contract.  *See generally* Dkt. Nos. 26, 33. Thus for purposes of this motion, the Court will assume that, had the signed Updated Loan Modification not included the handwritten term, it would be enforceable.

forgiveness over multiple years.[11]  The Kangs' return of the Updated Loan Modification with the added term was a counteroffer which the parties agree was never accepted by Nationstar.  *See* Dkt. No. 30 at 9 ("[A] signed agreement was sent to the defendant by the plaintiff Manjeet K. Kang on September 10, 2020 [] but Nationstar never signed it[.]").  Thus, the parties did not agree to the Updated Loan Modification and it is not an enforceable contract.

Even though Nationstar is not bound by the PRA term and the Kangs have not shown they are entitled to the relief, the Court is troubled by Nationstar's erroneous inclusion of the PRA term in the Summary Document, for seemingly not the first time.  *See Greer v. U.S. Bank Nat'l Ass'n as Tr. for Structured Asset Sec. Corp. Mortg. Loan Tr. Mortg. Pass-Through Certificates Series 2006-BC5*, No. 19 C 2618, 2019 WL 13249556, at *4 (N.D. Ill. July 29, 2019).  Such errors cause understandable confusion to consumers like the Kangs.

In sum, there is no evidence the parties entered into an enforceable agreement regarding the PRA loan forgiveness term, and this claim is dismissed.

**F.      The Parties Did Not Agree to the $5,000 Incentive Payment.**

The Kangs also argue they are entitled to the $5,000 Incentive Payment included in the trial period plan notice FAQ sent by Nationstar in June 2016.  *See* Dkt. No. 26-8 at 6.  Under the Incentive Payment, Nationstar would have needed to pay Plaintiffs $5,000 if the Kangs maintained the loan in good standing for six years.  *Id.*  Because the agreement was to be performed over more than one year, any such agreement was required to "be in writing, and signed by the party to be charged therewith" under Washington's statute of frauds.  WASH. REV. CODE § 19.36.010.  The Kangs provide no evidence of a signed agreement with Nationstar relating to the Incentive Payment.

---

[11] The Court need not determine whether the Kangs meant the handwritten term to ask for loan forgiveness for an additional $139,516.52 or merely different terms for $139,516.52 of the agreed $144,516.52.

1

2          There are three documents in the record that reference the Incentive Payment, none of

3    which comprise an enforceable agreement.  First, the Incentive Payment is mentioned in the FAQ

4    included with the June 2016 trial period plan notice sent by Nationstar with the HAMA application.

5    Dkt. No. 26-8 at 6.  The parties did not sign this FAQ document.  Nationstar also references the

6    Incentive Payment in its December 15, 2016 letter to the Kangs.  Dkt. No. 30-7.  There, Nationstar

7    explained that they mistakenly omitted the Streamline HAMP Affidavit from the prior loan

8    modification packet.  The letter stated, "to ensure that [Plaintiffs] are eligible for the Six Year Pay

9    for Performance incentive payment of $5,000[,]" the Kangs had to sign and return the affidavit "at

10   [their] earliest convenience." *Id*.  There is no evidence either party signed this affidavit.  Lastly,

11   as with the PRA loan forgiveness term, the Updated Loan Modification's offer of $5,000 in loan

12   forgiveness (as an equivalent to the Incentive Payment) is unenforceable because, as described

13   above, the Updated Loan Modification was never executed by the parties.

14          Thus, the Kangs are not entitled to either the $5,000 Incentive Payment or loan forgiveness

15   in that amount, and this claim is dismissed.

## G.   Nationstar Processed the Kangs' Biweekly Auto Payments as Agreed.

16          The Kangs allege that Nationstar wrongly implemented the biweekly autopayment process

17   by waiting to receive the second payment before applying the funds to the loan and by charging a

18   $2.50 processing fee for each payment.  Dkt. No. 1 ¶ 3.  To support their motion, Defendants

19   submitted the Biweekly AutoPay Authorization Form signed by the Kangs which explained that

20   "[a] full monthly payment is posted to my account on the next business day following the second

21   one-half (1/2) payment draft" and that there "may be a fee of up to $2.50 per debit."  Dkt. No.

22   26-10.  The Kangs do not dispute that they agreed to these terms or otherwise explain how

23   Defendants violated this agreement.  Accordingly, any claim arising from the processing of

24   biweekly payments is dismissed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**H.      Nationstar Processed the Kangs' Payments as Agreed.**

The Kangs' remaining claims all concern the processing of their payments from January 2022 to present, which they allege Defendants engineered to create an artificial delinquency on the mortgage.  The Kangs raise four categories of error.

First, the Kangs allege that when they exited the forbearance plan in Fall 2021, they were "bamboozled by the defendants to deposit more than the amount needed to bring the account current" and that when they asked Defendants to refund the excess amount, "[t]he defendants refused to do so with the excuse that the escrow analysis would be done in May 2022."  Dkt. No. 1 at 9; *see also* Dkt. No. 30 at 2, 11–13; Dkt. No. 34 at 5–7.  To support this allegation, the Kangs cite their own April 27, 2022 letter that includes this assertion (Dkt. No. 30-8) and a bank transaction summary showing the amounts they paid in September and October 2021 to Nationstar (Dkt. No. 34-3).  But there is no evidence that the amounts they paid exceeded what was owed, or that if such an excess existed, how it was handled by Defendants.  At this stage of the case, the Court cannot conclude an excess existed based on mere allegations.

Second, the Kangs allege Defendants mismanaged the Kangs' checks, either by never depositing them or depositing them into an "unapplied funds" account, which artificially increased the Kangs' debt.  Dkt. No. 1 at 6–7; Dkt. No. 30 at 7; Dkt. No. 34 at 9, 11, 14.  The Kangs admit that each of the identified checks was written for only the amount of principal and interest and did not include the required amount for escrow.  Dkt. No. 34 at 8.  As Defendants explained in multiple letters to Plaintiffs (Dkt. Nos. 26-19, 26-20), by signing the Escrow Agreement, they agreed to "pay Lender the Funds for Escrow Items unless this Agreement is terminated either by Lender, or pursuant to applicable law."  Dkt. No. 26-12 at 20.  Escrow Items include "taxes and assessments" and "premiums for any and all insurance."  *Id.*  Further the Deed of Trust explains:

1

2

3

> Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.

4

5

Dkt. No. 26-3 at 5.  Because the Kangs submitted partial payments by not including the escrow

6

amount, Defendants were authorized under the Deed of Trust to decide whether to deposit a partial

7

payment.  While understandably confusing to the Kangs, Nationstar's conduct was permitted by

8

the Deed of Trust.

9

        Third, the Kangs argue that even after they started paying their property taxes directly to

10

Pierce County, Defendants continued to pay the property taxes from the Kangs' escrow account,

11

increasing the delinquency.  Dkt. No. 1 at 6; Dkt. No. 30 at 14, 17, 18; Dkt. No. 34 at 8–9, 13.  As

12

explained above, the Kangs signed the Escrow Agreement in which they agreed that Defendants

13

would pay the property taxes through the escrow account.  Dkt. No. 26-12 at 20.  Neither the

14

Kangs' displeasure with and lack of trust in Defendants, nor the Kangs' unilateral decision to pay

15

the property taxes themselves amended the Escrow Agreement.  The Kangs also object to the

16

summary of property tax payments in Nationstar's corporate declaration (Dkt. No. 26-1 ¶ 24),

17

arguing the summary misrepresents who paid which property taxes.  Dkt. No. 30 at 17–18; Dkt.

18

No. 34 at 8, 13.  But the Kangs' decision to pay their property taxes directly (for which the County

19

apparently refunded them (*see* Dkt. No. 33 at 6)) does not mean Defendants were "pretending" to

20

make these payments or that the declaration describing these payments is false.  The Kangs have

21

not provided evidence that Defendants acted wrongly in their payment of the property taxes.

22

        Finally, the Kangs complain that Defendants illegally overcharged them for property

23

insurance.  Dkt. No. 1 ¶ 7, Dkt. No. 30 at 7.  The Kangs argue that Defendants chose property

24

insurance that cost $1,079 per year when the Kangs found cheaper insurance for $855 per year

(Dkt. No. 38 at 2–3).  The Kangs provide no authority to show their ability to find lower-cost property insurance means the property insurance Defendants identified was illegally excessive or that Defendants colluded with the insurance company.  And as explained above, under the parties' agreements, payment for property insurance was to go through Defendants; the Kangs could not unilaterally decide to pay the insurance company directly.  The Kangs fail to raise an issue of fact on Defendants' processing of the property insurance payments.

## III.   CONCLUSION

For these reasons, the Court GRANTS Defendants' motion for summary judgment.  Dkt. No. 26.  The case is dismissed with prejudice.

Dated this 20th day of September, 2024.

Kymberly K. Evanson
United States District Judge